**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**Beau Townsend Ford Lincoln Inc., D/B/A Beau Townsend Ford,**

    *Plaintiff,*

v.

**Case No. 3:15-cv-400
Judge Thomas M. Rose**

**Don Hinds Ford, Inc. D/B/A Don Hinds Ford,**

    *Defendant.*

---

**DECISION AND ENTRY GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT BY PLAINTIFF BEAU TOWNSEND FORD LINCOLN INC., ECF 45, AND GRANTING IN PART AND DENYING IN PART DEFENDANT DON HINDS FORD, INC.'S MOTION FOR SUMMARY JUDGMENT. ECF 38.**

---

The instant case provides a reminder that on the internet, no one knows you're a dog.[1] Quite possibly, no one figures out you're a Nigerian swindler. The swindler having made off with a princely sum, the Court must determine which party shall be paupered $736,225.40.

**I.   FACTS**

In September 2015, Plaintiff Beau Townsend Ford Lincoln d/b/a Beau Townsend Ford entered into a fleet deal with a commercial customer for seventy-five Ford Explorers. (Columbro Depo. at 70:6-23.) That deal, however, fell through, and Beau Townsend Ford's Commercial

---
[1] See http://www.washingtonpost.com/blogs/comic-riffs/post/nobody-knows-youre-a-dog-as-iconic-internet-cartoon-turns-20-creator-peter-steiner-knows-the-joke-rings-as-relevant-as-ever/2013/07/31/73372600-f98d-11e2-8e84-c56731a202fb_blog.html

1

Sales Manager, Jeff Columbro, sought new buyers for the Explorers. (Id. at 73:13- 1.) Beau Townsend Ford sold some of the Explorers to retail customers, but also tasked Columbro with attempting to sell them to other dealers. (Id.)

Columbro reached out to his contacts at other Ford dealers in the region. (Id.) One of the persons he contacted was John Colglazier, the Commercial Account Manager for Don Hinds Ford in Fishers, Indiana. (Colglazier Depo. at 6:2-3.) Columbro and Colglazier had met before and had worked together on dealer trades before, as had Beau Townsend Ford and Don Hinds Ford. (Id. at 14:9-20; Columbro Depo. at 217:15-25.) Past dealer trades between Beau Townsend Ford and Don Hinds Ford had been for one or two vehicles at a time, and had typically been paid through a check, delivered at the same time the vehicles were picked up. (Columbro Depo. at 217:15-25; Colglazier Depo. at 12:14-13:1.)

On September 25, 2015, Colglazier received an email from Jeff Columbro's email account, jcolumbro@btford.com, seeking to gauge Don Hinds Ford's interest in purchasing some of the Explorers. (Columbro Depo. at 116:12-21.) Colglazier responded that same day, inquiring about the price of the vehicles (Ex 3.) Columbro and Colglazier continued to exchange more information by email that day (nine emails in total), culminating in Don Hinds Ford's agreement to purchase twenty of the Explorers. (Id.) Columbro indicated that he would be sending copies of the invoices the next day. (Id.) He didn't.

Columbro handles the bulk of his practice through email, and he testified that he spends most of his day in front of his computer using Outlook, and that the bulk of the deals he works on are done over email. (Columbro Depo. at 41:4-17; 55:6-8.) Moreover, the fact that a deal like this would be done without a formal written contract was not unusual. (Id. at 48:13-21.)

2

Prior to September 28, 2015, Columbro received his correspondence from Colglazier from jcolglazier@donhindsford.com. On September 28, 2015, Columbro started receiving emails from the account "jcolglazier.donhindsford@gmail.com." Columbro Aff., ¶4. Previously, however, up until the time that Don Hinds Ford took delivery of the 20 Ford Explorers seven days later, all of the substance of the communications received by Jeff Columbro from John Colglazier was actually authored by John Colglazier. Columbro Aff., ¶5. The parties learned after-the-fact that Beau Townsend Ford's email system had been compromised. A filter had been set-up that removed all of Colglazier's emails from Columbro's inbox, forwarded them to a third party, who then sent them back to Columbro from the email account jcolglazier.donhindsford@gmail.com, which displayed the user name, <John Colglazier>.

Colglazier followed-up with Columbro on September 29, 2015, asking for the promised invoices, and Columbro said that he would have them once the Explorers moved "from fleet to stock." Colglazier later emailed Columbro under the subject line "Explorer's" to state that Don Hinds Ford would be paying by check. (Ex. 4.) This was the first time that the method of payment had been mentioned by either of the parties. A short time later, however, Colglazier received an email purportedly from Columbro requesting payment by wire transfer:

> Due to some tax related procedures we will prefer a wire transfer, let me know when you need wiring instructions?

ECF 44-1, PageID 1272, John Colglazier Dep., Ex. 32.

That same day, Colglazier received wiring instructions, purportedly from Columbro:

> Please use attached wiring instructions. Let me know when you plan coming [sic] so we can pull them out for you. Thank you
>
> Jeff.

ECF 44-1, PageID 1276, John Colglazier Dep., Ex. 33. The attachment instructed Colglazier to send the Purchase Monies for the 20 Ford Explorers by wire transfer to a Bank of America account in Missouri City, Texas for the benefit of "K.B. KEY LOGISTICS L.L.C." ECF 44-1, PageID 1277, John Colglazier Dep., Ex. 34.

Colglazier reasoned there was nothing unusual about a large-dollar deal for so many vehicles being paid by wire transfer and thought nothing of it. (Colglazier Depo. at 27:16-28:1.) The next day, Wednesday, September 30, 2015, Columbro forwarded the invoices for the remaining ten Explorers. Colglazier responded that Don Hinds Ford would send personnel to start picking up the Explorers on Monday, October 5, 2015.

On October 2, 2015, Colglazier sent an email to Columbro and copied Don Hinds Ford's Office Manager, Alicia Robinson. Colglazier's email asked if Robinson would be able to wire money to Beau Townsend Ford on October 5, and asked Columbro to review Colglazier's paperwork. (Ex. 8.) Columbro did not receive this email. Columbro Aff., ¶11. Nevertheless, a response email that same day confirmed that Colglazier's paperwork looked good and attached another copy of the wiring instructions:

> They look good. I did send you wire instructions few days ago. I have attached it again here. Thanks John

Colglazier Dep., Ex. 36.

Don Hinds Ford represents that the fact that the wiring instructions stated that Beau Townsend Ford was part of some other entity was not concerning because many dealerships use "d/b/a-s" or are part of larger organizations. (Colglazier Depo. at 33:20-25.) After receiving the instructions, Colglazier forwarded them to Robinson so she could arrange the payments.

4

Monday, October 5, 2015, Don Hinds Ford sent employees from its location in Fishers, Indiana, to Beau Townsend Ford's dealership in Vandalia, Ohio, to begin picking up the Explorers. Alicia Robinson took the steps necessary to complete the wire transfer, which would have to be done in three sequential transactions due to the daily transfer limits from Don Hinds Ford's bank. Thus, the transfers were to occur on October 5, 6, and 7, respectively. That same morning, an email asked Colglazier if Don Hinds Ford could start picking up units on Wednesday, rather than Monday, because Beau Townsend Ford needed additional time to complete some paperwork.

When Colglazier responded that Don Hinds Ford's folks were already on their way, a response requested a confirmation of the wire transfer. Colglazier emailed Alicia Robinson to ask her to send a confirmation to Columbro once the transfer was complete. (Ex. 14.) After Robinson sent the confirmation, a response informed that Don Hinds Ford's drivers arrived at 9:00 a.m. to pick up the first five Explorers. Colglazier then emailed Columbro to ask if Beau Townsend Ford received the wire transfer. (Ex. 15.) The email response: "Wire received. Thank you very much!" (Id.) Don Hinds Ford's employees picked up all of the Explorers on October 5, 6, and 7, 2015. (Columbro Depo. at 140:5-8; 150:19-151:4.)

On each of those days, Don Hinds Ford wired funds in accordance with the instructions it received, and on each of those days, Alicia Robinson forwarded a wire transfer confirmation to Columbro. On October 7, the day of the final transfer and the day the final Explorers were picked up by Don Hinds Ford, an email to Alicia Robinson confirmed the receipt of the final installment of the wired funds, "Great! Thanks Alicia." (Ex. 17.)

5

For nearly a week thereafter, Don Hinds Ford believed that the story was over. It had been given the titles to the vehicles (in this case, the Manufacturer's Certificates of Origin), allowed to drive all of the Explorers back to Indiana, and it had wired over $730,000. (Columbro Depo. at 208:3-6; 209:5- 13.)

On October 13, 2015, Colglazier received the following email from Columbro: "I am in deep dodo with the office. When should I tell them to expect payment." (Ex. 18) This email was followed up by a call from Columbro. (Colglazier Depo. at 54:1-13.) During that call, Columbro stated that Beau Townsend Ford had not received any payment from Don Hinds Ford. (Columbro Depo. at 87:11-88:12.) Colglazier responded that Don Hinds Ford had already sent payment according to the wiring instructions. (Id.) Columbro then told Colglazier that Columbro's email had been hacked and that Columbro had not sent any wiring instructions and was instead expecting a payment check. (Id.)

After that call, Beau Townsend Ford alerted law enforcement, as did Don Hinds Ford. (Columbro Depo. at 183:8-184:7; Colglazier Depo. at 65:1-19.) Don Hinds Ford also asked its IT consultants to investigate the source of the emails received by Don Hinds Ford. (Butler Depo. at 13:23-14:6.)

Similarly, Beau Townsend Ford's IT manager, John Wanamaker, also communicated with Beau Townsend Ford's email provider, FuseMail, and was advised that the wiring instruction emails had been sent from Columbro's account. Wanamaker also looked through Columbro's email account and discovered that certain email forwarding rules had been set up on Columbro's account. (Wanamaker Depo. at 89:25-91:19.)

6

On Saturday, October 17, 2015, Beau Townsend Ford's manager, Jamie Spencer, demanded that Don Hinds Ford return the Explorers, "In as much as Beau Townsend Ford has not received payment for the 20 Ford [E]xplorers, we are exercising our right to re-claim the vehicles and hereby demand that Don Hinds Ford return the 20 [E]xplorers to Beau Townsend Ford immediately." (Ex. 23.) Four days later, Don Hinds Ford's President, "Bud" Colglazier (John Colglazier's father), responded to Spencer's demand, noting that the wiring instructions were sent by Beau Townsend Ford and that Don Hinds Ford paid in accordance with the instructions sent by the seller. He also stated Don Hinds Ford's position that it had no knowledge of any false or misleading statements and, as such, was a good faith purchaser for value under the Uniform Commercial Code. (Ex. 24.) This lawsuit followed just over two weeks later.

Beau Townsend Ford uses a third-party service called FuseMail for its email service. (Wanamaker Depo. at 45:25-46:3.) All of its emails have the domain "btford.com" but are received and sent through FuseMail, and FuseMail allows users to remotely access their email accounts through a "webmail" interface. (Id. at 46:24-47:1; 52:18-23.) FuseMail also allows users to set up certain rules in their account that will forward emails to other email addresses. (Id. at 53:11-24.) This feature was known to Beau Townsend Ford, particularly the person responsible for its IT systems, John Wanamaker. (Id. at 27:13-15.) Wanamaker knew that some users had forwarding rules in place on their accounts. (Id. at 53:14-24.) Moreover, as the person in charge of Beau Townsend Ford's IT systems, Wanamaker had access to all of the company's email accounts. (Id. at 52:14-17.)

As of August 3, 2015, Jeff Columbro's email account had several active forwarding rules. (Id. at 94:1-23; 106:18- 22.) The forwarding rules in Columbro's account apparently looked for

7

emails from certain senders in incoming emails and would forward such emails to the email accounts named in the forwarding rule. (Id. at 100:23-101:17.) They would also, according to Wanamaker, move messages affected by the rule to a different folder, such as the deleted items folder. (Id.) Columbro claims he does not know how to use the webmail feature or set up forwarding rules. (Columbro Depo. at 220:11-20; Wanamaker Depo. at 53:11-24.) Theoretically, the only people who could access Columbro's account were Columbro or Wanamaker, the administrator of all accounts. (Wanamaker Depo. at 96:19-22; 110:1-22.) Despite having full access to all of the email account settings, Columbro and Wanamaker said they were not aware of the forwarding rules in place on Columbro's account. (Columbro Depo. at 220:11-20; Wanamaker Depo. at 94:24-95:8.)

On September 28, 2015, someone created a new email address on Google's Gmail service, with the address of jcolglazier.donhindsford@gmail.com. This email address was not created, used, or controlled by John Colglazier, or anyone else at Don Hinds Ford, for that matter. (Colglazier Depo. at 56:4-57:4.) Indeed, based on the records provided by Google, it appears that the account was set up by someone in Nigeria, Africa. (Ex. 25.) Nonetheless, emails from this email address started arriving in Jeff Columbro's inbox on September 28, 2015.

The Explorer-related emails that Don Hinds Ford received came directly from Columbro's email address, so they bore no indicia that they were from a potentially illegitimate sender. But that is not the case for the emails Beau Townsend Ford received from the "jcolglazier.donhindsford@gmail.com" account. On September 28, emails from that account started arriving in Columbro's inbox, with a different email address from Colglazier's actual

email. The email address was displayed in Microsoft Outlook, the program Columbro used to check his emails.

The same series of events happened to another dealership purchasing some of Beau Townsend Ford's seventy Explorers, Bill Estes Ford of Indianapolis, Indiana. (Id. at 73:13-74:15.) On October 9, 2015, Bill Estes Ford received wiring instructions ostensibly from Columbro. (Id. at 165:7-25.) These wiring instructions were different from those Columbro sent to Don Hinds Ford.

After receiving the wiring instructions, Bill Estes Ford called Beau Townsend to ask about the wiring instructions. (Columbro Depo. at 165:7-25.) Someone from Bill Estes Ford initially called the Beau Townsend offices about the wiring instructions and apparently obtained Beau Townsend Ford's bank account information over the phone. (Id.) Thereafter, Dick Staley from Bill Estes Ford called Jeff Columbro. (Id.) But Columbro was at an open house away from the dealership that day, so the call came to his cell phone. (Id. at 85:3-18.) When he was asked about the wiring information, Colombo stated that he had not sent it out because he was not even in the office. (Id.) Staley told Columbro that the dealership's office personnel had resolved the issue, so Columbro returned to his open house. (Id. at 165:7-25.)

In the meantime, John Wanamaker asked Columbro to change his email password and contacted FuseMail about the potential issue, and Beau Townsend Ford's Alina Dieli reported back to Staley that Columbro's email had been "hacked." (Id. at 172:5-18.) When Columbro finally returned to the dealership at around 3:30 pm that day, he found Wanamaker in a state of disbelief. (Id. at 172:19-173:3.)

Columbro went back to the dealership on Saturday and he reported to Dick Staley that something had happened to Beau Townsend Ford's email, but they were not certain what it was. (Columbro Depo. at 168:18-169:16.)

Over the weekend, FuseMail asked Wanamaker to forward them the email that had been sent to Bill Estes Ford. Wanamaker did not return to the dealership until the following Monday. At that time, he asked to review the email and wiring instructions that had been sent to Bill Estes Ford. (Wanamaker Depo. at 81:14-17.) He determined that the email had been sent from Jeff Columbro's account and that nothing in the email message looked like it had not come directly from Columbro. (Id. at 82:8-18; 114:5-12.) He did not respond to FuseMail that day.

Tuesday, October 13, 2015, Beau Townsend Ford realized that wiring instructions had been sent to Don Hinds Ford. That morning, Jeff Columbro received a call from a business contact asking why he had not responded to her emails, and Columbro responded that he had not received any such emails. (Wanamaker Depo. at 90:19-91:4.) He then called Wanamaker, who discovered that the emails Columbro had not seen were sitting in his deleted items folder. (Id.) This is what, after four days, caused Wanamaker to look at the settings in Columbro's email account. (Id.) That was when he discovered the email forwarding rules that had been set up in Colombo's account. (Id. at 91:5-19.) Columbro would later that day call John Colglazier to ask where the check was, and then Wanamaker learned that wiring instructions had also been sent to Don Hinds Ford. (Id. at 98:15-25.)

The records of the Bank of America account that received Don Hinds Ford's money show that the money was either withdrawn or transferred out by one of the members of the LLC that owned the bank account. (See ECF No. 36-1.) The last withdrawal occurred on October 13, 2015,

four days after Beau Townsend Ford learned of the wiring instructions that were sent to Bill Estes Ford.

Beau Townsend Ford sued Don Hinds Ford. Beau Townsend Ford's Amended Complaint asserts causes of action for (1) breach of contract, (2) conversion, and (3) unjust enrichment, constructive trust, and disgorgement. (See ECF No. 13.) "Don Hinds Ford has failed to deliver the Purchase Monies to Beau Townsend Ford." (ECF No. 13 at ¶¶ 36, 48, 60); "Inasmuch as Don Hinds Ford has failed to pay the Purchase Monies to Beau Townsend Ford, Don Hinds Ford is in breach of the parties' agreement." (Id. at ¶ 52.) The parties have both filed motions for summary judgment.

## II. STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment has the initial

burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. Id.

Both parties seek summary judgment on claims brought under Ohio law. In reviewing an Ohio claim, the Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, the Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the State.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir.2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir.1998). Also, to the extent that

the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. Id. (quoting *Bailey Farms, Inc. v. NOR-AM Chem. Co.,* 27 F.3d 188, 191 (6th Cir. 1994).

Finally, in ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III. LAW AND ARGUMENT

In Ohio, the essential elements of a breach of contract claim are: "(1) a binding contract or agreement was formed; (2) the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach." *Carbone v. Nueva Constr. Grp., L.L.C.*, 2017-Ohio-382, 2017 WL 444323, at *3 (Ohio App. Feb. 2, 2017). The plaintiff bears the burden of proof on all of these issues. *Id.* But "[d]amages are not awarded for a mere breach alone." *Rasnick v. Tubbs*, 126 Ohio App.3d 431, 710 N.E.2d 750, 752 (3d Dist. 1998). Rather, the damages that can be awarded for a breach of contract are "those which are the natural or probable consequence of the breach of contract or damages resulting from the breach that were within the contemplation of both parties at the time of making the contract." *Eckel v. Bowling Green State Univ.*, 2012-Ohio-3164, 974 N.E.2d 754, 768 (10th Dist.). Determining what was within the contemplation of the parties requires consideration of "all the circumstances known to them when they dealt with one another." *Brown v. Spitzer Chevrolet Co.*, 181 Ohio App.3d 642,

13

2009-Ohio-1196, 910 N.E.2d 490, 501 (5th Dist.). Or, as the Sixth Circuit has stated, "[i]n contract law, unlike tort law, not all proximate consequential damages are recoverable, but only those which the parties, including the breaching party, could reasonably contemplate would arise from the breach." *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 119 (6th Cir. 1976).

To prove the first element of a breach of contract claim, that a binding contract or agreement was formed, a party must establish the essential elements of a contract: (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) an exchange of consideration; and (5) certainty as to the essential terms of the contract. *Juhasz v. Costanzo*, 144 Ohio App.3d 756, 762, 761 N.E.2d 679 (Ohio App. 2001). A contract is formed when there is mutual assent and consideration. *Nilavar v. Osborn*, 127 Ohio App.3d 1, 11, 711 N.E.2d 726 (Ohio App. 1998).

Don Hinds Ford and Beau Townsend Ford agreed that Beau Townsend Ford would sell to Don Hinds Ford 20 Ford Explorers and that Don Hinds Ford would pay Beau Townsend Ford the amount of $736,225.40. See ECF 13, Verified Amended Complaint for Injunctive Relief and Monetary Damages, ¶¶ 9, 10; ECF 14, Don Hinds Ford, Inc.'s Answer to Amended Complaint, at 4. Don Hinds Ford asserts that the parties modified this contract to include a term concerning payment, that payment was to be made by wire transfer. That Don Hinds Ford received an email from Beau Townsend Ford's email account does not make this amendment a contractual term, what is required is a meeting of the minds, agreement in fact.

In order to constitute a valid contract, there must be a "meeting of the minds" of the parties which is achieved by both an offer and acceptance of the contract's provisions. See *Noroski v. Fallet*, 2 Ohio St.3d 77, 79 (1982). There must be a meeting of the minds as to the essential terms of the contract. 17 *Ohio Jurisprudence 3d* (1980), 446, Contracts, § 17; *Isquick v. Classic*

*Autoworks, Inc.*, 89 Ohio App.3d 767, 772 (1993). One Ohio court set forth this basic proposition of contract law, as follows:

> To constitute a valid contract there must be parties capable of contracting, a lawful subject matter, a sufficient consideration, a meeting of the minds of the parties, an actual agreement between the parties to do or to forbear doing the thing proposed in the agreement, and a compliance with the law in respect of any formal requisites which may pertain to the contract. It is fundamental that mutual consent is essential to every agreement, and that as a rule there can be no binding contract where there is no real consent. *Feldman v. Roth*, 12 Ohio Law Abs. 121 (1932).
>
> For a contract to be binding, the parties must have a distinct and common intention which is communicated by each party to the other, and this intention of the parties must refer to legal relations. In other words, to constitute a valid contract, there must be a meeting of the minds of the parties, and there must be an offer on the one side and an acceptance on the other. 17 *Ohio Jurisprudence 3d* (1980), Contracts,§ 17.

*Bhavnani v. Voldness*, No. 95APE03-284, 1995 WL 578124, at *2-3 (Ohio App. Sept. 28, 1995)(quotation omitted); see also *Grant v. DeGryse* , 1991 WL 254211 (Ohio App. Nov. 15, 1991) (finding terms to which the parties had not agreed to be unenforceable).

Beau Townsend Ford delivered to Don Hinds Ford the 20 Ford Explorers, fulfilling its obligations under the parties' agreement. Answer, at 6; see also John Colglazier Dep., at 63-64. Beau Townsend Ford has not received any funds from Don Hinds Ford, or from the funds wired to Missouri City, Texas on behalf of Don Hinds Ford. Accordingly, Don Hinds Ford has breached its agreement with Beau Townsend Ford, as Beau Townsend Ford has not been paid for the 20 Ford Explorers.

Ohio Rev. Code §1302.77 lists a seller's principal remedies upon a buyer's breach. Where the seller seeks to recover the price, Ohio Rev. Code §1302.77 refers to Ohio R. Code §1302.83.

This section states that "when the buyer fails to pay the price as it becomes due the seller may recover * * * the price * * *of goods accepted[.]" Ohio Rev. Code §1302.83(A)(1). See *Willoway Nurseries v. Curdes*, 1999 Ohio App. LEXIS 4819 (Lorain Co. October 13, 1999). When a buyer accepts goods the buyer must pay for such goods. See Ohio Rev. Code §1302.65(A). Don Hinds Ford accepted the 20 Ford Explorers from Beau Townsend Ford. Therefore, Beau Townsend Ford is entitled to be paid by Don Hinds Ford. Accordingly, summary judgment will be granted in favor of Beau Townsend Ford and against Don Hinds Ford in the amount of $736,225.40.

The Court notes that Don Hinds Ford is not a "good faith purchaser for value" by virtue of having wired money to the Bank of America account of K.B. KEY LOGISTICS in Missouri City, Texas. See Answer, at 10. A "good faith purchaser for value" purchases from a seller that obtained "voidable" title from a previous seller. See Ohio Rev. Code §1302.44. The subsequent purchaser acquires "good title" despite there being irregularities in the transaction by which the seller acquired the property. See Id.; see also *Creggin Group v. Crown Diversified Indus. Corp.*, 113 Ohio App. 3d 853 (Warren Co. 1996). Neither is the "good faith purchaser" doctrine implicated as between the original seller and the subsequent seller, Beau Townsend Ford and Don Hinds Ford. While parties that purchased the 20 Ford Explorers from Don Hinds Ford might qualify as "good faith purchasers for value" such that Beau Townsend Ford cannot seek relief from such subsequent purchasers, the subsequent sales do not extinguish Don Hinds Ford's original obligation to Beau Townsend Ford. Accordingly, the "good faith purchase for value" doctrine has no application and Don Hinds Ford owes Beau Townsend Ford $736,225.40.

While Don Hinds Ford claims the result is unjust in light of the fact that it wired funds to the Bank of America account based upon wire instructions that appeared to come from Beau

Townsend Ford, this transfer does not satisfy its obligation to Beau Townsend Ford. C.f. *Arrow Truck Sales, Inc. v. Top Quality Truck & Equip., Inc*., 2015 U.S. Dist. LEXIS 108823 (M.D. Fla. August 18, 2015). (purchaser of trucks did not satisfy its obligations to the seller, and purchaser breached its contract with the seller, where the purchaser wired the purchase monies to a third party based upon fraudulent wiring instructions where seller had not delivered the trucks to the purchaser and that *purchaser's* email was hacked). As for any negligence on behalf of Beau Townsend Ford, Ohio does not allow action for tort in performance of contract. Id. Accordingly, the plaintiff in Arrow was the purchaser that had wired the money to Duluth, Georgia but not received the trucks, and the defendant was the seller that did not receive payment for the trucks.). Here, there was no meeting of minds to a contractual provision that payment be made by wire transfer.

Don Hinds Ford's defense of equitable estoppel is unprevailing. Under the doctrine of equitable estoppel, relief is precluded where one party induces another to believe certain facts are true and the other party changes his position in reasonable reliance to his detriment on those facts. *Bank One Trust Co., N.A. v. LaCour* , 131 Ohio App. 3d 48, 55 (Franklin Co. 1999). Equitable estoppel requires that the proponent prove four elements: (1) that the adverse party made a factual misrepresentation; (2) that the misrepresentation was misleading; (3) that the misrepresentation induced actual reliance which was reasonable and in good faith; and (4) the proponent suffered detriment due to the reliance. *Doe v. Blue Cross/Blue Shield of Ohio* (1992) 79 Ohio App. 3d 369, 379 (Franklin Co., 1992), see also *First Energy Solutions v. Gene B. Glick Co*., 2007 Ohio App. LEXIS 6186 (Summit Co. December 28, 2007); *TBLD Corp. v. Ravenna Inv. Co*., 2002 Ohio App. LEXIS 5315 (Summit Co. Oct. 2, 2002).

As to the first element, a showing of fraud is necessary. *State ex rel. Ryan v. State Teachers Retirement Sys.*, 71 Ohio St. 3d 362, 368 (1994); *First Energy Solutions v. Gene B. Glick Co.*, 2007 Ohio App. LEXIS 6186, *17 (Summit Co. December 28, 2007). It was not Beau Townsend Ford that instructed Don Hinds Ford to send funds to "K.B. KEY LOGISTICS, L.L.C." in Missouri City, Texas. Beau Townsend Ford made no representation to Don Hinds Ford regarding such "wire instructions," much less any misrepresentations that would satisfy the first element of equitable estoppel. Since there were no misrepresentations, Don Hinds Ford's equitable estoppel defense fails.

Both parties would each have the Court find that the other was in the best position to avoid the misfortune that occurred in this case. "If there is a policy implicit in the UCC's rules for the allocation of losses due to fraud, it surely is that the loss be placed on the party in the best position to prevent it." *Northpark Nat. Bank v. Bankers Trust Co.*, 572 F. Supp. 524, 535 (S.D.N.Y. 1983).

Beau Townsend Ford asserts Don Hinds Ford was in the best position to prevent the loss, pointing out "red flags" that it believes should have alerted Don Hinds Ford that the wiring instructions were likely sent by an "imposter." Beau Townsend points to the fact that the parties' previous transactions, involving one or two vehicles at a time, were handled by way of checks; that the beneficiary of the fraudulent wire instructions was "K.B. KEY LOGISTICS LLC", not Beau Townsend Ford; that the wiring instructions were sent in substandard English;[2] and that the wiring instructions provided that the funds should be sent to an account in Missouri City, Texas, whereas Beau Townsend Ford is located in Vandalia, Ohio. Don Hinds Ford points to Beau Townsend Ford's unsecured email and to its slow response to signs that something was amiss.

---

2 While the wiring instructions were written in substandard English, the first mention of payment by wire was in response to an email Colglazier had given the subject line "Explorer's." As to this point, the Court notes increases to to near ubiquity of errors due to voice recognition technology and auto-correct.

Here, both parties were negligent in their business practices. It cannot be said that either was "obviously in the best position to protect their own interest." Beau Townsend Ford should have maintained a more secure email system and taken quicker action upon learning that it might have been compromised. Don Hinds should have ascertained that an actual agent of Beau Townsend Ford was requesting that it send money by wire transfer.

Additionally, "Ohio courts have held that the doctrine of equitable estoppel will not be used to benefit parties who were negligent in their business transactions, and who were obviously in the best position to protect their own interest." *Washington Mutual Bank v. Chiappetta*, 584 F. Supp. 2d 961, 972 (N.D. Ohio 2008); *Countrywide Home Loans, Inc. v. Robbins*, 2010 U.S. Dist. LEXIS 29363 (S.D. Ohio Mar. 4, 2010); *Bank of N.Y. v. Fifth Third Bank of Cnt. Ohio* (2002 Ohio App. LEXIS 273) (Delaware Co. Jan. 30, 2002) (when a party does not protect its own interest "this Court will not invoke equity to compensate for shortcomings easily avoided.") Again, because both parties were capable of preventing the loss, this principle does not apply.

As Don Hinds Ford asserts, because Beau Townsend Ford prevails on its contract claim, Beau Townsend Ford's unjust enrichment, conversion, and constructive trust/disgorgement claims fail as a matter of law as they are duplicative of its contract claims. "[Q]uasi-contract claims are unavailable to a party to an express contract absent fraud or illegality. *Donald Harris Law Firm v. Dwight–Killian*, 166 Ohio App.3d 786, 2006-Ohio-2347, 853 N.E.2d 364, ¶ 14 (Ohio App. 2006). *Kott v. Gleneagles Prof'l Builders & Remodelers, Inc.*, 2012-Ohio-287, ¶ 14, 197 Ohio App. 3d 699, 703, 968 N.E.2d 593, 596 (Ohio App. 2012).

### IV.  Conclusion

Because Don Hinds Ford has not conveyed the contractual purchase price to Beau

19

Townsend Ford, summary judgment is awarded to Beau Townsend Ford on its breach of contract claim and Motion for Partial Summary Judgment by Plaintiff Beau Townsend Ford Lincoln Inc., ECF 45, is **GRANTED**. Because Beau Townsend Ford prevails on its contract claim, Beau Townsend Ford's unjust enrichment, conversion, and constructive trust/disgorgement claims fail as a matter of law as they are duplicative of its contract claims. Thus, the Court will award summary judgment to Don Hinds Ford on Beau Townsend Ford's equitable claims and **GRANTS IN PART** Don Hinds Ford, Inc.'s Motion for Summary Judgment. ECF 38. Don Hinds Ford will be ordered to pay Beau Townsend Ford the sum of $736,225.40. Don Hinds Ford, Inc.'s Motion for Summary Judgment, ECF 38, is **DENIED** with regard to Beau Townsend Ford's breach of contract claim. Beau Townsend's Motion for Award of Prejudgment and Post-Judgment Interest on any Monetary Judgment in its Favor, ECF 58, remains pending.

  **DONE** and **ORDERED** this Monday, September 25, 2017.

                   s/Thomas M. Rose
                   _____
                    THOMAS M. ROSE
                  UNITED STATES DISTRICT JUDGE